UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | |
|---|---|
| WUILGER ALBERTO RAMIREZ CASTELLANO,<br><br>Petitioner,<br><br>v.<br><br>KELLY STRONG, et al.,<br><br>Respondents. | No. 6:26-CV-125-H |

**ORDER**

Wuilger Alberto Ramirez Castellano entered this country illegally several years ago. As a result, the Immigration and Nationality Act mandates that he be detained during his removal proceedings. Almost one year ago, acting in accord with that mandate, ICE placed Ramirez Castellano into custody as his removal proceedings continue. Given the length of his detention and the lack of certainty as to the end date of his proceedings, Ramirez Castellano fears that he will be detained indefinitely. He therefore contends that the Fifth Amendment's Due Process Clause requires his release.

But Ramirez Castellano's detention is by no means indefinite. To the contrary, he can leave whenever he desires. He can go to his home country, and he can go to any country that will have him. What he lacks the right to do is remain at liberty in the United States pending his removal proceedings. As an alien seeking admission to the United States, Ramirez Castellano only has those privileges provided to him by Congress. Because Congress mandates his detention, precedent and our Nation's history and tradition make clear that his detention comports with due process, notwithstanding its length. His petition for a writ of habeas corpus (Dkt. No. 1) is therefore denied.

## 1. Background

Ramirez Castellano is a native and citizen of Venezuela. Dkt. No. 1 ¶ 5. In 2023, he was detained while illegally crossing into the United States at or near Eagle Pass, Texas. *Id.* ¶ 6. Amidst a wave of illegal entries across the Texas border and a resulting lack of space to hold detainees, ICE released Ramirez Castellano into the United States on humanitarian parole. Dkt. No. 8 at 2; 8 U.S.C. § 1182(d)(5)(A). He was then placed into removal proceedings with a Notice to Appear. Dkt. No. 9 at 4. The NTA charged Ramirez Castellano with removability as an alien "present in the United States without being admitted or paroled," as well as an immigrant "not in possession of a . . . valid entry document." *Id.* at 7; 8 U.S.C. § 1182(a)(6)(A)(i), (a)(7)(A)(i)(I).

On August 26, 2025, ICE re-detained Ramirez Castellano "for the pendency of his removal proceedings." Dkt. No. 8 at 2. Because he was paroled under Section 1182(d)(5)(A), the revocation of his parole subjected him to mandatory detention under Section 1225(b)(2)(A). *See Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 498 (5th Cir. 2026) (generally describing Section 1225); *Goyo Martinez v. Villegas*, No. 1:25-CV-256, 2026 WL 114418, at *3 (N.D. Tex. Jan. 15, 2026) (discussing mandatory detention for humanitarian parolees). Months passed before Ramirez Castellano appeared before an immigration judge. His first hearing—a case-management hearing—was held in mid-April 2026. *See* Dkt. No. 9 at 9. According to Ramirez Castellano, a portion of that hearing included arguments on the merits of his application for relief. Dkt. No. 10 at 5. Publicly available case data from the Executive Office of Immigration Review indicates that Ramirez Castellano received a master calendar hearing in early June 2026, and yet another master calendar hearing has been scheduled for August 10, 2026.

Typically, an immigration case features one "master calendar hearing," followed by an "individual hearing." *Zhang v. Gonzales*, 432 F.3d 339, 346 n.5 (5th Cir. 2005). The former "advises the alien of the charges against him" or is used for the purpose of preparing for the individual hearing. *Id.*; *Texas v. United States*, 524 F. Supp. 3d 598, 613 (S.D. Tex. 2021). Contested cases may "require one or more master calendar hearings in preparation for [the] individual hearing." *Texas*, 524 F. Supp. 3d at 613 (quoting *De Ren Zhang v. Barr*, 767 F. App'x 101, 103 (2d Cir. 2019)). At the individual hearing, the immigration judge "typically issues a decision on the merits of an alien's claims" and may, for example, order the alien removed. *Id.* at 613–14 (quoting *Zhang*, 432 F.3d at 346 n.5). If the alien is ordered removed, he is subject to detention during the 90-day "removal period." 8 U.S.C. § 1231(a)(1)(A). And "[d]uring the removal period, detention is mandatory." *Johnson v. Guzman Chavez*, 594 U.S. 523, 528 (2021) (citing 8 U.S.C. § 1231(a)(2)). However, the removal period is stayed—and thus the alien remains in pre-removal detention—if he files a timely appeal with the Board of Immigration Appeals. *See Riley v. Bondi*, 606 U.S. 259, 269 (2025).

While the recent movement in Ramirez Castellano's case suggests a resolution will be reached in the reasonably foreseeable future, no one can say with certainty when his detention will come to an end. Further hearings might be required; he might also appeal an adverse ruling if any is issued in his case. Months—even years—might pass before a resolution is reached. *See Kum v. Ross*, No. 6:25-CV-451, 2025 WL 3113646, at *2 & n.2 (W.D. La. Oct. 22, 2025) (collecting cases). Ramirez Castellano has been detained for almost a full year at the time of this Order.

In March 2026, Ramirez Castellano petitioned for a writ of habeas corpus. Dkt. No. 1. The petition states one claim for relief: that "[his] continued detention violates substantive due process by depriving him of his fundamental liberty interest in remaining free from detention," given the length of his detention and that the respondents "have not acted promptly" in resolving his case. *Id.* ¶¶ 21–22. The Court ordered the respondents to show cause why Ramirez Castellano's petition should not be granted. Dkt. No. 4; *see* 28 U.S.C. § 2243. The respondents answered (Dkt. Nos. 8; 9), and Ramirez Castellano replied (Dkt. No. 10). The petition is ripe for review.[1]

While this petition was pending, a panel of the Fifth Circuit issued its decision in *Sosnava Rodriguez v. Ortega*, 180 F.4th 702 (5th Cir. 2026). That decision essentially adopted the reasoning Ramirez Castellano offers here: that aliens in Ramirez Castellano's position, having a liberty interest in being free from detention, "are entitled by the Constitution to a hearing at some point to determine the justification for their detention." *Id.* at 711 (emphasis omitted). The two-member majority disagreed as to when a hearing was proper and what factors were appropriate. Judge Southwick reasoned "that the Government may detain aliens under Section 1225 "for ninety days but no longer without a bond hearing," at which the government must present evidence of "dangerousness," "flight risk," or "another [legitimate] justification [for] why an unadmitted alien must be detained." *Id.* at 727–28. Judge Graves, however, reasoned that "prudence dictates that . . . courts must convene a

[1] At the time of the petition's filing, Ramirez Castellano was detained at the Eden Detention Center in Eden, Texas. Dkt. No. 1 ¶ 23. ICE's Online Detainee Locator System indicates that he has since been transferred to Diamondback Correctional Center in Watonga, Oklahoma. However, "[p]ersonal jurisdiction and venue are determined at the outset of litigation and are not affected by subsequent events." *Smilde v. Snow*, 73 F. App'x 24, 26 (5th Cir. 2003); *see also Moler v. Wells*, 18 F.4th 162, 166 n.7 (5th Cir. 2021). Thus, the Court retains jurisdiction over Ramirez Castellano's petition.

hearing to establish whether the noncitizen is either dangerous or a flight risk no more than 30 days after their initial detention" and that "90 days is an excessively long period." *Id.* at 730 (Graves, J., concurring). He also reasoned that such aliens are entitled to a "pre-deprivation hearing" as provided in Section 1226(a). *Id.*

But eight days later, the Fifth Circuit vacated *Sosnava Rodriguez* for rehearing en banc. *Sosnava Rodriguez v. Ortega*, Nos. 26-50183, 26-50219, & 26-50221, ___ F.4th ___, 2026 WL 2014647 (5th Cir. July 10, 2026). As a result, the panel opinion is no longer binding precedent. *See* 5th Cir. R. 41.3. And on July 21, 2026, the Fifth Circuit issued a precedential stay of the due-process-based habeas relief conferred to the petitioners in that case and similarly situated petitioners. *Sosnava Rodriguez v. Ortega*, Nos. 26-50183, 26-50219, & 26-50221, 2026 WL 2104747 (5th Cir. July 21, 2026).[2] Even so, the Court considers the panel opinion in *Sosnava Rodriguez* to the extent it is persuasive.[3]

**2. Legal Standard**

"[A]bsent suspension, the writ of habeas corpus remains available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const. art. I, § 9, cl. 2). With 28 U.S.C. § 2241, Congress authorized federal courts to resolve habeas petitions, including in immigration-detention cases. *Zadvydas v. Davis*, 533 U.S. 678, 687–88 (2001). Habeas exists solely to "grant relief from unlawful imprisonment or custody." *Pierre v. United States*, 525 F.2d 933, 935–36 (5th Cir. 1976). Thus, for the writ

[2] Unless indicated otherwise, citations to *Sosnava Rodriguez* in this Order refer to the original panel opinion.

[3] Unlike the *Sosnava Rodriguez* petitioners, Ramirez Castellano seeks release and does not ask for a bond hearing. Dkt. No. 1 at 7 (prayer for relief). Because the precedential stay in *Sosnava Rodriguez* is summary in nature and does not address distinct claims based on extended periods of detention, the Court assumes without deciding that the precedential stay does not govern here.

to issue, the petitioner must be "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *see Orellana v. Kyle*, 65 F.3d 29, 31 (5th Cir. 1995). A court considering a habeas petition must "determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243.

**3. Analysis**

"It is well established that the Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (internal quotation marks omitted). No doubt, every person has an interest in securing their own liberty. The Fifth Amendment applies to "person[s]," rather than just "citizens," so aliens are no different. *See Sosnava Rodriguez*, 180 F.4th at 733 (Wilson, J., dissenting) ("I readily agree . . . that Petitioners enjoy the protections of the Fifth Amendment."). The majority in *Sosnava Rodriguez* reasoned that this bedrock principle largely foreclosed discussion of the asserted liberty interest. *See id.* at 719. Thus, it said, aliens like Ramirez Castellano have some form of right to be free from detention, and lingering questions about the meaning of national sovereignty, the authority of the government to exclude, and "the serious administrative needs and concerns inherent in the necessarily extensive . . . efforts" to enforce this Nation's immigration laws are ultimately eclipsed by the alien's asserted liberty interest. *Cf. Zadvydas*, 533 U.S. at 700.

Respectfully, the Court disagrees. As explained below, Ramirez Castellano's form of detention is not unconstitutional. Analyzing this issue requires the searching two-part inquiry provided by the Supreme Court in *Washington v. Glucksberg*. 521 U.S. 702, 720–21 (1997). And unlike the typical habeas petitioner, what Ramirez Castellano seeks is not mere release, but release onto the soil of the United States. That asserted right cannot be located

within our Nation's historical conception of liberty. It is a diminution of sovereignty that the Constitution does not require. And even were the Court to adopt a *Zadvydas*-like inquiry here, it does not follow that Ramirez Castellano's relief is warranted.

**A. The *Glucksberg* test applies to Ramirez Castellano's claim.**

"Liberty is a term of many meanings." *Obergefell v. Hodges*, 576 U.S. 644, 737 (2015) (Alito, J., dissenting). Under the Constitution, however, an asserted liberty interest is only protected if it is one of "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Dep't of State v. Muñoz*, 602 U.S. 899, 910 (2024) (quoting *Glucksberg*, 521 U.S. at 720–21). The Court must "start with a careful description of the asserted fundamental liberty interest." *Id.* (internal quotation marks omitted). Once the Court determines the nature of the sought-after liberty, it must then determine whether that liberty is secured by the Constitution. *Id.*

The *Sosnava Rodriguez* majority, however, declined to apply the *Glucksberg* test. In its view, *Glucksberg* does not apply here "because the aliens claim . . . the long-recognized, fundamental right to be free from physical restraint by the Government." *Sosnava Rodriguez*, 180 F.4th at 719 (citation modified). In its view "[t]here [is] no need to consider history and tradition because the freedom"—"in whatever form"—"is at the core of liberty protected by the Due Process Clause." *Id.* (internal quotation marks omitted).

But this conclusion sidesteps the underlying inquiry: *whether* a due-process detention claim for an alien in pre-removal proceedings is akin to those forms of detention that precedent declares to be forms of physical restraint. *See id.* (collecting cases). That inquiry is necessary for several reasons. First, although detention is the classic deprivation of liberty, it assumes too much to say that all forms of detention are the same. Even

enumerated rights carry "subsidiary questions" as to the meaning of their plain terms. *Wolford v. Lopez*, 609 U.S. ___, 146 S. Ct. 2023, 2043 (2026). Conduct that falls within the plain meaning is merely "presumptively protect[ed]"—not unquestionably protected. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022); *see also Chiles v. Salazar*, 607 U.S. ___, 146 S. Ct. 1010, 1021 (2026) (same). "Anyone advocating a different reading must"—and certainly can—"overcome that presumption." *Fulton v. City of Philadelphia*, 593 U.S. 522, 571 (2021) (Alito, J., concurring in judgment).

Moreover, the Fifth Amendment does not say, in the literal sense, that "No person shall be detained without due process of law." It says, "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V. The typical act of civil detention, of course, deprives the person of "liberty." *Zadvydas*, 533 U.S. at 690; *Foucha v. Louisiana*, 504 U.S. 71, 78–79 (1992). The *Glucksberg* Court recognized that "liberty" includes "heightened protection against government interference with" a variety of unenumerated interests. 521 U.S. at 719–20. The physical-restraint principle is near the heartland of liberty, but nothing in *Glucksberg* suggests that this principle is any less at danger of being "subtly transformed into the policy preferences" of unelected judges. *Id.* at 720. Indeed, in *Reno v. Flores*, the Supreme Court considered whether juvenile aliens were subject to impermissible physical restraint when they sought release into the care of adults in the United States. 507 U.S. 292 (1993). The Court answered in the negative: "[T]he right at issue [was] the alleged right of a child . . . to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution." *Id.* at 302. Their detention claims failed. *See id.* at 315.

Thus, the Court cannot assume that Ramirez Castellano's detention claim *ipso facto* qualifies as a form of physical restraint under the Due Process Clause. *Glucksberg*'s inquiry counsels "utmost care" before seizing a matter from "the arena of public debate and legislative action." 521 U.S. at 720 (quotation omitted). Here, the stakes are high: "We are dealing . . . with an exercise of the Nation's sovereign power to admit or exclude foreigners" and a potential diminution of sovereignty itself. *Fiallo v. Bell*, 430 U.S. 787, 795 n.6 (1977). Before concluding, as the *Sosnava Rodriguez* panel did, that the right to due process is implicated here, the Court carefully describes the asserted right and determines whether it is one of those rights protected by the Constitution.

### B. Ramirez Castellano seeks liberty to remain in the United States, not liberty in the abstract.

Ramirez Castellano paints his liberty interest with a broad brush. He asserts that his ongoing detention is unconstitutional simply because it "depriv[es] him of his fundamental liberty interest in remaining free from detention." Dkt. No. 1 ¶ 21. This can be interpreted in one of two ways. For one, he might mean that he seeks "liberty in the abstract," such that any form of release from custody would cure his constitutional claim. *Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999) (Easterbrook, J.). In the alternative, he might mean that he seeks "liberty *in the United States*" such that, say, release followed by immediate removal to his native Venezuela would not satisfy his demands. *Id.* (emphasis in original).

It is difficult to categorize Ramirez Castellano's petition as seeking abstract liberty. That is because, subject to certain exceptions not relevant here, "[t]he Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense under this subsection . . . prior to the completion of [removal] proceedings." 8 U.S.C.

§ 1229c(a)(1). Voluntary departure is not dependent on the scheduling of an immigration hearing because the alien can seek voluntary departure either "prior to or at the master calendar hearing." *Texas*, 524 F. Supp. 3d at 613 (quoting 8 C.F.R. § 1240.26(b)(1)(i)(A)). "An alien in [this] position can . . . end[] his detention immediately." *Parra*, 172 F.3d at 958. And what is more, indigent aliens may have the cost of their departure covered by the United States if the Attorney General determines that their removal is in the government's "best interest." 8 U.S.C. § 1231(e)(3)(C). Additionally, as of May 2025, the government has provided "cost-free travel" to an alien's country of origin along with "an 'exit bonus' for each illegal alien who voluntarily and permanently departs the United States." 90 Fed. Reg. 20357, 20358 (May 9, 2025). Thus, not only can Ramirez Castellano leave detention at any time, but he can get paid for it, too.

However, despite almost a year of detention, Ramirez Castellano has not sought voluntary departure. Because he has not sought voluntary departure, the Attorney General has not given it to him. He cannot be seeking abstract liberty because, if that were so, his detention would be a crisis of his own making. Rather, Ramirez Castellano seeks "liberty *in the United States* [as] someone no longer entitled to remain in this country." *Parra*, 172 F.3d at 958 (emphasis in original). For that reason, he remains in detention. And for that reason, he seeks judicial intervention.

The Court recognizes that its conclusion here is not true of every case. If it were not possible for Ramirez Castellano to seek voluntary departure—for instance, because the government refused to grant voluntary departure or provide the funds necessary to accept it—then his case might closely resemble the conditions faced by aliens in post-order-of-removal detention. *See Zadvydas*, 533 U.S. at 701–02. Those aliens are well and truly

subject to physical restraint because even an alien's own cooperation will not guarantee removal to his country of removal. *E.g.*, *Ladak v. Noem*, 814 F. Supp. 3d 712, 718–19 (N.D. Tex. 2025) (noting that the alien's country of origin declined to issue travel documents despite the alien's cooperation). It might also be true that, where the government conditions release upon an unconstitutional condition, an alien's continued detention would implicate the heartland of physical restraint protected by the Constitution. *Cf. Dep't of Tex., VFW v. Tex. Lottery Comm'n*, 760 F.3d 427, 437–38 (5th Cir. 2014) (discussing the unconstitutional-conditions doctrine). In such scenarios, the only decisionmaker relevant to the question of release is the government itself.

But that is not the case here. On the question of Ramirez Castellano's ongoing detention, there are two decisionmakers: the government and Ramirez Castellano himself. Both have an independent power to secure his release. For the government's part, it is actively working to secure Ramirez Castellano's removal. That is no surprise, given that "detained aliens get priority" in removal proceedings. *Banyee v. Garland*, 115 F.4th 928, 933 n.4 (8th Cir. 2024) (Stras, J.) (citation modified). Ramirez Castellano could expedite the process by voluntary departure, but he has not. His decision to not avail himself of that process is not the government's responsibility. *See Black v. Almodovar*, 156 F.4th 171, 186 (2d Cir. 2025) (Menashi, J., dissenting) (citing *Parra*, 172 F.3d at 958). What Ramirez

Castellano seeks is not just release but release into the United States. The Court therefore analyzes his due-process claim through the lens of that asserted interest.[4]

### C. Ramirez Castellano's due-process claim for liberty in the United States fails.

#### i. The Due Process Clause does not require the United States to release aliens in ongoing removal proceedings after a certain period of time.

It is here that Ramirez Castellano's claim falters. Life in the United States, though highly prized, cannot be defined as a universal liberty. It cannot belong to every human being on this planet, and it cannot be acquired by adverse possession. But that is the necessary implication of his due-process claim because it seeks a liberty beyond that to which the law entitles him. *See* Dkt. No. 1 ¶ 22 (asserting a latent due-process right to release).

The reasons for defining liberty in the United States as an exclusive right are existential and fundamental. Recall that the doctrine of substantive due process only protects those liberties "deeply rooted in this Nation's history and tradition." *Muñoz*, 602 U.S. at 911 (quoting *Glucksberg*, 521 U.S. at 721). "The intellectual foundation of Founding Era constitutionalism was social-contract theory," which began from a presupposition of

---

[4] Even if Ramirez Castellano's claim could be categorized as seeking liberty in the abstract, courts have consistently held in the post-final-order-of-removal context that an alien's delay in effectuating his own removal justifies a longer period of detention without raising a constitutional problem. *See Glushchenko v. DHS*, 566 F. Supp. 3d 693, 711 (W.D. Tex. 2021) (citing *Pelich v. INS*, 329 F.3d 1057, 1060 (9th Cir. 2003)); *Hook v. Lynch*, 639 F. App'x 229, 229–30 (5th Cir. 2016); *Gonzalez v. Gills*, No. 20-60547, 2022 WL 1056099, at *1 (5th Cir. Apr. 8, 2022). It does not stand to reason that the respondents are violating Ramirez Castellano's abstract interest in liberty when they have provided a clear pathway to liberty for his benefit that he has thus far declined to request. *See Parra*, 172 F.3d at 958; *Almodovar*, 156 F.4th at 186 (Menashi, J., dissenting) ("It is a perverse interpretation of the Due Process Clause under which Congress, by affording [an alien] *more* process to contest his removal and to seek immigration relief, thereby invalidates its own authority to detain the alien until the process concludes.") (emphasis in original).

God-given, natural rights and considered the interaction of those rights with the organization of political society. Jud Campbell, Natural Rights and the First Amendment, 127 Yale L.J. 246, 268 (2017). The upshot of that theory is that a natural right was one that "humans could rightly exercise on their own, without a government." *Id.*[5] The notion that anyone has a natural right to liberty in any particular political society to which they do not belong, including the United States, is a contradiction in terms.

The problem, however, is not merely one of natural liberty. "Nationality is essentially a political idea, and belongs to the sphere of public law." *United States v. Wong Kim Ark*, 169 U.S. 649, 707 (1898) (citing *Shanks v. DuPont*, 28 U.S. (3 Pet.) 242, 248 (1830) (Story, J.)). "The jurisdiction of the nation within its own territory is necessarily exclusive and absolute . . . . All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source." *The Chinese Exclusion Case*, 130 U.S. 581, 604 (1889) (quoting *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812) (Marshall, C.J.)). Said differently, the very nature of sovereignty empowers the state to exclude aliens and to effect their removal. *See Muñoz*, 602 U.S. at 916; *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953) (collecting cases). Rather than suggest a political right of aliens to remain in the United States, historic authorities have consistently spoken of a

---

[5] *See also* John Locke, Two Treatises of Government 131 (Hollis ed., 1764) ("Those who are united into one body, and have a common established law and judicature to appeal to, with authority to decide controversies between them, and punish offenders, are in *civil society* one with another: but those who have no such common people . . . are still in the state of nature . . . .").

political right *of the Nation* to remove aliens as they deem proper.[6] To adopt Ramirez Castellano's notion of a latent due-process right would rebuke the long-held theory of sovereign authority underpinning the Nation's system of immigration laws. *See Thuraissigiam*, 591 U.S. at 139.

True, it is "well[-]established" that aliens such as Ramirez Castellano have some due-process rights. *J.G.G.*, 604 U.S. at 673 (quotation omitted). But in the immigration context, these rights are mostly procedural, rather than substantive. *See id.* Moreover, the procedural rights secured by the Constitution are an affirmation and function of sovereignty rather than a diminution. For instance, providing process to an individual claiming citizenship preserves the boundaries of the political community. *Cf. Chin Yow v. United States*, 208 U.S. 8, 13 (1908) (ordering writ of habeas corpus for petitioner claiming citizenship at port of entry). And offering process in the form of habeas review to aliens challenging the denial of a right provided by statute asserts the political community's will as established in the Nation's immigration laws. *See J.G.G.*, 604 U.S. at 673 (2025).

With these principles in mind, the nature of due process in the context of alien removal comes into view. "Non-citizen immigrants do not have a due-process 'liberty' interest (or private right) to enter the United States or continue to reside in the country after entering it." *Lopez-Campos v. Raycraft*, 175 F.4th 713, 759 (6th Cir. 2026) (emphasis omitted) (Murphy, J., dissenting). What they seek is a "privilege," to the extent such privilege is

---

[6] *See Muñoz*, 602 U.S. at 912 (quoting Statement of Gouvernor Morris, *in* 2 Records of the Federal Convention of 1787, at 238 (M. Farrand ed., 1911)) ("[E]very Society from a great nation down to a club ha[s] the right of declaring the conditions on which new members should be admitted."); *Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893) (quoting Emerich de Vattel, The Law of Nations lib. 1, ch. 19, § 230 (1758)) ("Every nation has the right to refuse to admit a foreigner into the country . . . in virtue of its natural liberty, it belongs to the nation to judge whether its circumstances will or will not justify the admission of the foreigner.").

afforded by statute. *Thuraissigiam*, 591 U.S. at 139 (quoting *Plasencia*, 459 U.S. at 32); *Muñoz*, 602 U.S. at 912 (citing James Madison for the same proposition).

Congress has expressly declined to permit certain aliens to be at liberty in the United States. That includes aliens like Ramirez Castellano who arrived at a port of entry and were not clearly entitled to admission. *See Buenrostro-Mendez*, 166 F.4th at 498; 8 U.S.C. § 1225(b)(2)(A). The reasons for doing so are plain. As Judge Wilson noted in his dissent in *Sosnava Rodriguez*, "American immigration courts consistently have the highest failure to appear . . . rates of any state or federal courts in the country," with three-quarters of removal proceedings ending with an order of removal due to an alien's failure to appear. 180 F.4th at 744 n.3 (quoting Mark Metcalf, U.S. Immigration Courts & Aliens Who Disappear Before Trial, Ctr. for Immigr. Stud. (Jan. 24, 2019)). Several decades ago, "90 percent" of aliens released on recognizance "abscond[ed] and [were] not removed from the United States." *Id.* at 744 (quoting 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997)). And when aliens are released mid-removal proceedings, their cases go to "the back of line." *Banyee*, 115 F.4th at 933 n.4.

And when an alien's case goes to the back of the line, it will likely remain there. To call the existing backlog of immigration cases "overwhelming" would be charitable. Five years ago, there were "[m]ore than 1.2 million cases . . . inching their way through the immigration courts." *Niz-Chavez v. Garland*, 593 U.S. 155, 192 (2021) (Kavanaugh, J., dissenting). That number has nearly tripled to 3.47 million as of the second quarter of 2026.[7] In 2015, there were nearly 40,000 cases pending before the Board of Immigration

---

[7] Executive Office of Immigration Review Adjudication Statistics, Dep't of Just. (last updated July 24, 2026), https://perma.cc/B9GB-42YS.

Appeals. *Amica Ctr. for Immigr. Rts. v. EOIR*, 822 F. Supp. 3d 119, 134 (D.D.C. 2026). Now, that number is over 200,000. *Id.* And despite the BIA's recent attempt to streamline the appeal process through summary denials, a district court has vacated that decision on the ground that the policy "fundamentally curtail[s] the availability of meaningful administrative review." *Id.* at 128.

To be sure, Congress has extended greater liberty to other aliens unlawfully in the United States. *See, e.g.*, 8 U.S.C. § 1226(a). And Ramirez Castellano himself once received humanitarian parole, though that parole has now been revoked. *See* 8 U.S.C. § 1182(d)(5)(A). At this point, no statute privileges Ramirez Castellano with liberty in the United States. His mandatory detention lasts "until certain [removal] proceedings have concluded." *Jennings v. Rodriguez*, 583 U.S. 281, 297 (2018). "[N]othing in the statutory text imposes any limit on the length of detention," and the Supreme Court has rejected attempts to impose "implicit limitations on the length of detention" as a result. *Id.*[8]

Because Congress has denied Ramirez Castellano the privilege of remaining at liberty in the United States, he has no due-process right to release onto the soil of this country. The relief he seeks is the very sort of subtle transformation that the Supreme Court has warned against. *Glucksberg*, 521 U.S. at 720. It would functionally halt all attempts to remove the vast majority of aliens who are in removal proceedings. Because neither the INA nor Due Process Clause compel that outcome, the Court rejects Ramirez Castellano's claim. Thus, the respondents may detain Ramirez Castellano for the duration of his

[8] While *Jennings* rejected a reading of the statute that implied a limit on detention, it did not address the constitutional question here. 583 U.S. at 312.

removal proceedings, irrespective of the length of his proceedings, provided that the liberty to depart the United States remains.[9]

**ii. The arguments in favor of imposing a time limit on alien detention pending the completion of removal proceedings are unpersuasive.**

In reaching this conclusion, the Court recognizes that several courts post-*Jennings* have nonetheless intuited that the Due Process Clause limits detention in the context of removal proceedings as time wears on. It is a question that the Fifth Circuit has not expressly addressed as a matter of precedent. *See Sosnava Rodriguez*, 180 F.4th 702, *vacated pending rehr'g en banc*, 2026 WL 2014647; *Wekesa v. U.S. Att'y*, No. 22-10260, 2022 WL 17175818, at *1 (5th Cir. Nov. 22, 2022) (unpublished opinion denying habeas relief for prolonged detention under Section 1226(c)); *Shokeh v. Thompson*, 369 F.3d 865, 872 (extending *Zadvydas* to certain Section 1226 claims), *vacated as moot*, 375 F.3d 351 (5th Cir. 2004). These opinions raise several distinct arguments favoring an implied limit for detention, but each one is incorrect.

[9] The Court notes that Ramirez Castellano's petition may separately fail in light of the Supreme Court's decision in *Mezei*, which rejected an indefinite-detention claim brought by an alien who was denied entry into the United States and detained at Ellis Island for nearly two years. *See* 345 U.S. at 209. In *Zadvydas*, the Supreme Court distinguished *Mezei* for certain post-final-order-of-removal cases but declined to address the core holding of *Mezei* as regards unadmitted aliens. 533 U.S. at 693; *see Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 622–23 (5th Cir. 2006) (discussing *Zadvydas*).

Post-*Zadvydas*, some courts have attempted to distinguish *Mezei* from Section 1225(b) cases. *See Rosales-Garcia v. Holland*, 322 F.3d 386, 405–08 (6th Cir. 2003); *Sosnava Rodriguez*, 180 F.4th at 723; *Cortes Vasquez v. Rodriguez*, No. SA-26-CA-1241, 2026 WL 1196684, at *8 n.7 (W.D. Tex. Mar. 26, 2026); *Bermudez Paiz v. Decker*, No. 18-CV-4759, 2018 WL 6928794, at *10–12 (S.D.N.Y. Dec. 27, 2018). Other courts have suggested that *Mezei* is no longer binding due to subsequent precedent. *Rosales-Garcia*, 322 F.3d at 415 (contending *Mezei* was implicitly overruled by *United States v. Salerno*, 481 U.S. 739 (1987), and progeny); *Giri v. Lyons*, ___ F. Supp. 3d ___, No. 5:26-CV-149, 2026 WL 1361557, at *8 n.1 (S.D. Tex. May 12, 2026). Another court, however, held that *Mezei* forecloses relief for Section 1225 claims like the one here. *Petgrave v. Aleman*, 529 F. Supp. 3d 665, 677 (S.D. Tex. 2021).

Because the general principles of due process prohibit relief here, the Court declines to address *Mezei*'s continuing vitality.

**a. *Zadvydas* is not applicable to prolonged detention prior to the final order of removal, and *Demore* is not to the contrary.**

The first set of opinions, including the three nonprecedential Fifth Circuit opinions, essentially import *Zadvydas* into the context of detention pending the completion of removal proceedings.[10] *Zadvydas* itself addressed the indefinite detention of two previously admitted aliens who were ordered removed and detained pending their removal from the United States. *See* 533 U.S. at 684–86. In that case, the Court addressed the government's two justifications for civil detention: preventing flight and preserving public safety. *Id.* at 690–91. It found neither justification persuasive in the context of prolonged detention awaiting removal and instead determined that, after a six-month period, detention was inappropriate where "no significant likelihood of removal in the reasonably foreseeable future" existed. *Id.* at 701. Later, in *Demore v. Kim*, Justice Kennedy explained that the logic of *Zadvydas* might extend to aliens detained pending the resolution of removal proceedings, too. 538 U.S. 510, 532–33 (2003) (Kennedy, J., concurring). Though the Supreme Court later rejected a constitutional-avoidance reading of Section 1226, *see Jennings*, 583 U.S. at 299, some courts adopting this position have held that the INA violates the Due Process Clause as applied to petitioners in these circumstances. *See German Santos*, 965 F.3d at 208. The Fifth Circuit panel in *Sosnava Rodriguez* suggested that the upshot of *Zadvydas*'s application is that it requires, at latest, a hearing after 90 days. 180 F.4th at 728.

[10] *See Sosnava Rodriguez*, 180 F.4th at 720–21; *Wekesa*, 2022 WL 17175818, at *2 (Dennis, J., dissenting); *Shokeh*, 369 F.3d at 872; *German Santos v. Warden, Pike Cnty. Corr. Facility*, 965 F.3d 203, 208 (3d Cir. 2020) (Bibas, J.); *Lopez-Arevelo v. Ripa*, 801 F. Supp. 3d 668, 683–84 (W.D. Tex. 2025); *Rodriguez v. Frink*, 823 F. Supp. 3d 678, 683 n.3 (S.D. Tex. 2026); *Ramirez v. Watkins*, Civ. A. No. B:10-126, 2010 WL 6269226, at *8 (S.D. Tex. Nov. 3, 2010), *not adopted as moot*, Dkt. No. 31 (Dec. 8, 2010).

These opinions fail to consider the gulf between the liberty interest raised in *Zadvydas* and the one raised in cases like the one at bar. There is a material difference between an abstract interest in liberty and a liberty interest in remaining in the United States. *Parra*, 172 F.3d at 958; *cf. Glucksberg*, 521 U.S. at 720–21 (requiring a careful assessment of the liberty interest). The *Zadvydas* petitioners were deprived of their most basic liberty interest because they were subject to "indefinite, perhaps permanent, detention." 533 U.S. at 699. As noted above, an alien's cooperation in removal proceedings will not guarantee his removal. *Ladak*, 814 F. Supp. 3d at 718–19. *Zadvydas* petitioners thus cannot always effect voluntary departure. But aliens like Ramirez Castellano can accept voluntary departure at any time. *Parra*, 172 F.3d at 958. He can voluntarily depart; he can even be paid to leave. And he can seek to leave at any time—not just at an immigration-court hearing. *See supra*, Analysis § 3(B). Because the detention is neither potentially indefinite nor permanent, *Zadvydas* is simply inapplicable.

Even so, courts in this category urge that *Demore* counsels in favor of an implicit limit, emphasizing that decision's discussion of the "very limited time of the detention at stake" for aliens in removal proceedings. *Shokeh*, 369 F.3d at 872; *Sosnava Rodriguez*, 180 F.4th at 720–21. Others emphasize the "bare majority" at play in *Demore* as grounds to hew to the limited view espoused by Justice Kennedy's concurrence. *Ramirez*, 2010 WL 6269226, at *8. However, as a panel of the Eighth Circuit observed, "nothing [in *Demore*] suggests that length determines legality. To the contrary, what matters is that detention pending deportation 'ha[s] a definite termination point'—deporting or releasing the alien—making it 'materially different' from the 'potentially permanent' confinement authorized by other statutes." *Banyee*, 115 F.4th at 932 (quoting *Demore*, 538 U.S. at

528–29). Even *Zadvydas* did not go so far, as it permitted prolonged detention provided the requisite likelihood of removal remained. *See* 533 U.S. at 701. And the mere fact that a decades-old decision produced a 5-4 split fails, on its own force, to suggest that a more constrained doctrine is required. What is required, under equally binding precedent, is to consider the Nation's sovereign attributes in the field of immigration. And those precedents weigh heavily in favor of detention until the relevant deportation proceedings "have concluded." *Jennings*, 583 U.S. at 297.

**b. *Thuraissigiam* and related cases are not distinguishable.**

A second line of argument—adopted by the Sixth Circuit in *Lopez-Campos* and by the *Sosnava Rodriguez* majority—contends that the application of mandatory-detention cases like *Thuraissigiam* and *Demore* to detention under Section 1225(b)(2)(A) "stretches" those cases "beyond their logical breaking points." *Lopez-Campos*, 175 F.4th at 733. The point of emphasis for this argument is that "*Thuraissigiam* involved the 'due process rights of an alien *seeking initial entry*[,]' and the Supreme Court expressly constrained *Thuraissigia*m's holding to noncitizens 'in respondent's position.'" *Id.* (quoting *Thuraissigiam*, 591 U.S. at 139–40) (emphasis in original)). These courts also distinguish *Thuraissigiam* in light of the fact that the petitioner there "was stopped and detained within only 25 yards of the border shortly after crossing it." *Id.* As the Fifth Circuit said in *Sosnava Rodriguez*, "[t]he Government is trying to equate [*Thuraissigiam*] to the entry of hundreds of miles and years of residence." 180 F.4th at 715. These courts thus hold that *Thuraissigiam* "does not control where, like in the instant case, noncitizens have resided within the United States for years." *Lopez-Campos*, 175 F.4th at 734; *Sosnava Rodriguez*, 180 F.4th at 716. That same logic, if true, would apply to Ramirez Castellano.

Respectfully, however, this Court disagrees. As the Court recently explained at length in *Diaz Patino v. Villegas*, this "characterization of *Thuraissigiam* is almost the reverse of the Supreme Court's reasoning and holding." 822 F. Supp. 3d 718, 725 (N.D. Tex. 2026) (discussing *Lopez-Arevelo*, 801 F. Supp. 3d 668); *see also Sosnava Rodriguez*, 180 F.4th at 734–35 (Wilson, J., dissenting). *Thuraissigiam* "reinforced a longstanding tradition that 'an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application.'" *Diaz Patino*, 822 F. Supp. 3d at 725 (quoting *Thuraissigiam*, 591 U.S. at 139) (further quotation omitted). Part of that tradition includes "the entry-fiction doctrine, which treats certain noncitizens on U.S. territory as not having 'entered' as a matter of law." *Mullin v. Al Otro Lado*, 609 U.S. ___, 146 S. Ct. 2079, 2108 n.6 (2026) (Sotomayor, J., dissenting). Unadmitted aliens, whether in or outside of the country, are "'treated' for due process purposes 'as if stopped at the border.'" *Thuraissigiam*, 591 U.S. at 139 (quoting *Mezei*, 345 U.S. at 215). The Supreme Court even went so far as to directly attack the Fifth and Sixth Circuits' proposed distinction, saying that the sovereign power to exclude "would be meaningless if it became inoperative as soon as an arriving alien set foot on U.S. soil," even if the alien remained "in the country for years pending removal." *Id.* And even if *Thuraissigiam* were as limited as the Sixth Circuit contends, it would not abrogate a century's worth of precedent on the limited nature of due process in the context of alien removal. *See Petgrave*, 529 F. Supp. 3d at 676–77 (discussing *Thuraissigiam*).

The *Sosnava Rodriguez* panel criticizes the entry-fiction doctrine. It dismisses it as "far more than a convenient legal fiction," but "a complete fantasy." 180 F.4th at 715. Legal fiction though it may be, it is one that is recognized by precedent. *See Martinez-Aguero*, 459

F.3d at 623 (citing *Lynch v. Cannatella*, 810 F.2d 1363, 1373 (5th Cir. 1987)). And while *Sosnava Rodriguez* divines a distinction between unadmitted aliens and aliens who have "acquired [a] domicil or residence within the United States," that is a misread of the precedent. *See* 180 F.4th at 715 (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892)). That line from *Nishimura Ekiu* discusses different categories of aliens subject to entry fiction, including those who have never "been admitted into the country pursuant to law." *Thuraissigiam*, 591 U.S. at 138 (quoting *Nishimura Ekiu*, 142 U.S. at 660); *Sosnava Rodriguez*, 180 F.4th at 734 (Wilson, J., dissenting). Moreover, if that distinction were grounded in precedent, it is hard to see why *Thuraissigiam* applies the fiction to those "paroled . . . for years pending removal," given that anyone illegally in the United States for that period of time typically finds a place to live with the intent to remain there. *See* 591 U.S. at 139.

Additionally, the Sixth Circuit justifies its position in reliance on this line from *Mezei*: "It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in the due process of law." *Mezei*, 345 U.S. at 212; *Lopez-Campos*, 175 F.4th at 732. That line might sound capacious. Indeed, the Sixth Circuit took it to mean that illegal entrants are entitled to a higher degree of due process. *Lopez-Campos*, 175 F.4th at 733–34. So, too, did the *Thuraissigiam* dissenters. 591 U.S. at 191–92 (Sotomayor, J., dissenting). But *Mezei*, even though it recognizes some constitutional protection for illegal entrants, applied the same entry doctrine as *Thuraissigiam*. *See* 345 U.S. at 213 (observing that the petitioner's excluded status was not changed by "temporary refuge on land").

For these reasons, the Court is not persuaded that *Thuraissigiam* and the Supreme Court's many cases outlining the entry-fiction doctrine are distinguishable here.

**c. The balancing test in *Mathews v. Eldridge* has no application here.**

A third set of courts, notwithstanding the Supreme Court's well-established precedent of limited procedural due process for aliens, opts instead to apply the malleable three-factor balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976).[11] At the outset, it bears repeating that Ramirez Castellano seeks release, rather than simple procedure. Even *Mathews*'s first factor requires a "private interest that will be affected by the official action." *Id.* at 335. But "[t]he Due Process Clause does not confer a 'right to a hearing' in the abstract; rather, it does so only as a prerequisite to a deprivation of 'life, liberty, or property.' Before a plaintiff can prevail on a due process claim, []he must show that a liberty or property interest exists and that the State has interfered with that interest." *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 475 & n.14 (5th Cir. 2017) (Richman, J., dissenting) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). Since aliens subject to mandatory detention under Section 1225 have no liberty interest in remaining in the United States, *Mathews* has no bearing on this case.

Even if the Court were to concede that aliens like Ramirez Castellano have a liberty interest in remaining in the United States, *Mathews* would still not apply. That test, while common, is not the only tool for resolving procedural due process challenges. The Supreme Court said as much: "[W]e have never viewed *Mathews* as announcing an all-embracing test for deciding due process claims." *Dusenbery v. United States*, 534 U.S. 161, 168 (2002). In

[11] *Sosnava Rodriguez*, 180 F.4th at 718; *Hernandez-Lara v. Lyons*, 10 F.4th 19, 27–28 (1st Cir. 2021); *Black v. Decker*, 103 F.4th 133, 145–51 (2d Cir. 2024).

fact, the "Supreme Court when confronted with constitutional challenges to immigration detention has not resolved them through express application of *Mathews*." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022).

The application of *Mathews* to Section 1226 cases is "unwarranted on the test's own terms." *Ladak*, 814 F. Supp. 3d at 725. The Supreme Court applied *Mathews* in *Landon v. Plasencia*, emphasizing that its balancing test was appropriate for "long-time lawful permanent resident[s]" in contrast to "detentions of aliens at the border or returning lawful permanent residents who had spent time abroad." *Id.* (citing 459 U.S. at 32–34). Aliens in the former category have "gain[ed] admission to our country and [have begun] to develop the ties that go with permanent residence," meriting a level of due process more analogous to that of a citizen. *Landon*, 459 U.S. at 32. In the latter category, aliens "request[] a privilege and [have] no constitutional rights." *Id.*; *Thuraissigiam*, 591 U.S. at 138–39 ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.") (quotation omitted). Critically, aliens who are released into the United States pending removal "are treated for due process purposes as if stopped at the border." *Thuraissigiam*, 591 U.S. at 139 (internal quotation marks omitted); *see* 8 U.S.C. § 1182(d)(5)(A) (noting that paroled aliens are not admitted and are "dealt with in the same manner as that of any other applicant for admission to the United States"); 8 C.F.R. § 1.2 (same).

The Court previously considered a general due-process challenge arising under *Mathews* in *Diaz Patino*. *See* 822 F. Supp. 3d at 724–26. The same reasoning in that case is true for cases involving prolonged detention. Supreme Court precedent "leave[s] no room for a multi-factor 'reasonableness' test," and instead "the government can detain an alien for

as long as deportation proceedings are still '*pending*.'" *Banyee*, 115 F.4th at 933 (quoting *Demore*, 538 U.S. at 527 (emphasis in original)).[12]

**d. Familial interests and past obedience of the laws do not create a substantive liberty interest.**

Finally, the Fifth Circuit suggests in *Sosnava Rodriguez* that because the petitioners "had children in the United States [and] owed obedience to the laws of this country," they possess a substantive liberty interest here. 180 F.4th at 716. That assertion is twice undermined by Supreme Court precedent and is thus unpersuasive.

Start with the asserted familial interest. The Fifth Circuit's reasoning appears to stem from the privilege of canceling removal to prevent "exceptional and extremely unusual hardship" to a citizen-child. *Id.* at 711 (quoting 8 U.S.C. § 1229(b)(1)). "From the beginning, the admission of noncitizens into the country was characterized as of favor and not of right." *Muñoz*, 602 U.S. at 912 (citation omitted). Thus, the Supreme Court has held that citizens do not "have procedural due process rights in the visa proceedings of others." *Id.* at 917. "Although Congress has tended to show a continuing and kindly concern for the unity and the happiness of the immigrant family . . . this has been a matter of legislative grace rather than a fundamental right." *Kerry v. Din*, 576 U.S. 86, 97 (2015) (plurality op. of Scalia, J.) (citation omitted). *Muñoz* makes clear that merely having a family member in the United States does not endow an alien with some additional right to formal admission—much less a right to be at liberty on American soil.

The asserted legal-obedience interest fares no better. This position appears to stem from dicta in *Plyler v. Doe*: "A resident, alien born, is entitled to the same protection under

[12] *Sosnava Rodriguez* adopted the *Mathews* factors without discussion of whether their application is appropriate here. 180 F.4th at 718. Accordingly, the opinion fails to persuade.

the laws that a citizen is entitled to. He owes obedience to the laws of the country in which he is domiciled . . . ." *Sosnava Rodriguez*, 180 F.4th at 714 (quoting 457 U.S. 202, 212 n.11 (1982)) (further quotation omitted). But *Plyler* was an equal-protection case and says nothing about the clear state of affairs regarding alien due process. *See id.* at 736 (Wilson, J., dissenting). Besides, sovereignty and obedience to the laws is the starting point. It hardly stands to reason that the obedience to the laws expected of aliens in the United States unlawfully gives them some right to be at liberty here.

* * *

To be sure, Ramirez Castellano has an interest in liberty. That cannot be denied. But he does not have the liberty to remain in the United States. So long as he can secure release from outside the United States by means of voluntary departure, the mere prolonged nature of his detention during his removal proceedings does not suffice to raise a substantive due process claim. "He has the keys in his pocket." *Parra*, 172 F.3d at 958. Thus, the claim for relief fails.

**D. Even if an implicit limit on detention during removal proceedings exists, this case is distinguishable.**

For the reasons above, the Court cannot conclude that the Due Process Clause of the Fifth Amendment impliedly limits the period of detention for aliens in removal proceedings so that they can secure release onto the soil of the United States. Doing so unacceptably limits the power of the people through Congress and the Executive to police its borders and preserve the meaning of political community. However, the Court recognizes that the *Sosnava Rodriguez* panel saw matters differently. Furthermore, the Supreme Court recently granted a petition for a writ of certiorari on the question of prolonged detention in the Section 1226(c) context. *Genalo v. Black*, No. 25-886 (June 15, 2026). While the Court will

not "read tea leaves" to guess at the disposition of the pending Fifth Circuit and Supreme Court cases,[13] the Court alternatively considers whether an implicit limit on detention, if required by the Constitution, requires release in this case. It does not.

Following *Zadvydas*, the key inquiry under an implicit-limit regime is to determine whether continued detention is "unreasonable." *German Santos*, 965 F.3d at 210. That must also include a consideration of "the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive [DHS] efforts to enforce this complex statute, and the Nation's need to speak with one voice in immigration matters." *Nguyen v. Noem*, 797 F. Supp. 3d 651, 659 (N.D. Tex. 2025) (quoting *Zadvydas*, 533 U.S. at 700). It must also account for "the average amount of time necessary to litigate the relevant issues [the alien] raises." *Ramirez*, 2010 WL 6269226, at *15.

Importantly, the Court must also recognize the limited role of habeas relief. It is well-established that "the writ of habeas corpus is prospective in nature" and "does not compensate for past wrongful incarceration." *Lindh v. Murphy*, 521 U.S. 320, 342 (1997) (Scalia, J., dissenting); *see Nguyen*, 797 F. Supp. 3d at 669–70 (collecting cases). So, "the Court does not review all possible previous errors, it asks only whether the confinement is justified" at this moment. *Nguyen*, 797 F. Supp. 3d at 670 (citing *Lane v. Williams*, 455 U.S. 624, 631 (1982)).

The Court recognizes, as petitioner urges, that much of his time in detention is the product of an IJ's consideration of certain preliminary and administrative issues regarding removability. *See* Dkt. No. 10 at 5. But in light of the prospective nature of habeas relief,

---

[13] *Perez v. Stephens*, 745 F.3d 174, 180 (5th Cir. 2014).

the Court only considers that evidence to the extent it suggests further detention awaits Ramirez Castellano. While the end point for Ramirez Castellano's detention is not entirely clear, as noted above, the Court concludes that it is at least significantly likely to end in the reasonably foreseeable future. *See Zadvydas*, 533 U.S. at 701. That is because, in the course of this case, publicly available information indicates that Ramirez Castellano has received several hearings, with another master calendar hearing approaching in a matter of days. His petition and reply are devoid of discussion as to whether he intends to appeal any adverse ruling, if one is issued in his case. And if he declines to appeal, the government has a distinct interest, pursuant to *Zadvydas*, in effectuating his removal. *See* 533 U.S. at 699 (measuring reasonableness with respect to "assuring the alien's presence at the moment of removal").

To be sure, there is always the possibility of appeal, which would extend pre-removal detention. *See Riley*, 606 U.S. at 269. The Court recognizes that, among courts who adopt the implicit-limit test, "an alien's good-faith challenge to his removal" is not "[held] against him, even if his appeals or applications for relief have drawn ought the proceedings." *German Santos*, 965 F.3d at 211. But because the record bears insufficient evidence to indicate whether Ramirez Castellano will seek appeal in light of an adverse decision, the Court declines to reach that issue. The information before the Court is simply that, after a lengthy period of inaction, the government has begun in earnest the process of removal proceedings. Because those proceedings are well underway and significantly likely to conclude in the reasonably foreseeable future, the Court would alternatively deny habeas relief in the event an implicit limit to detention is required by the Due Process Clause of the Fifth Amendment.

**4. Conclusion**

Section 1225(b)(2)(A) subjects Ramirez Castellano to mandatory detention until the conclusion of his removal proceedings. *See Buenrostro-Mendez*, 166 F.4th at 498. His detention is not indefinite, however. He may leave the United States—and thus his confinement—whenever he wishes by asking for voluntary departure. The Constitution by no means requires that he be released into the United States merely because his detention has been prolonged. That contention runs headlong into the basic notions of American sovereignty. And even if this Court were inclined to read an implicit limit to the period of detention for aliens in removal proceedings, the Court concludes that the length of Ramirez Castellano's detention is reasonable. Accordingly, Ramirez Castellano's petition for a writ of habeas corpus (Dkt. No. 1) is denied.

So ordered on August 3, 2026.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE